MYERS, P.J.,
 

 for the Court.
 

 ¶ 1. Darrius Eubanks was convicted in the Circuit Court of Hinds County of capital murder, with the underlying felony of felonious child abuse. The trial court sentenced Eubanks to life in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole. Aggrieved by his conviction and sentence, Eubanks appeals, asserting that the trial court erred in admitting hearsay testimony and deprived him of his fundamental right to present a defense. Finding no error, we affirm.
 

 FACTS
 

 ¶2. On the morning of November 19, 2003, Eubanks and his girlfriend, Deyasha Johnson, were off work from their jobs at an IHOP Restaurant. Johnson and Eu-banks planned to catch up on household chores and move furniture into their apartment at 1595 West Highland Drive in Jackson, Mississippi. Eubanks and Johnson had lived together for about five to six months. The couple shared the apartment with Johnson’s two children, four-year-old Daviyon Johnson and two-year, eleven-month-old Inecia McNeil. The children called Eubanks “Daddy,” but he was not related to them by blood or marriage.
 

 ¶ 3. The pair had lived in the apartment for about a month, but they did not have a telephone in the apartment. After doing laundry, Johnson called her aunt from a payphone about the availability of a family member’s truck to move furniture later in the day. Johnson discovered, however, that her grandmother was critically ill at Central Mississippi Medical Center (CMMC), less than ten minutes away from the apartment. Johnson returned to the apartment to change clothes, and Eubanks offered to watch the children as he had often done before. Johnson arranged for a ride to CMMC with a friend. At 6:00 p.m. that evening, about six hours later, Johnson returned to the apartment.
 

 ¶4. Johnson testified that on returning home, she entered the apartment and called to her children, going up the hallway to their bedroom. In the children’s bedroom, she found Daviyon lying on the floor with Eubanks standing beside him. Inecia was standing against a wall, not moving, and she appeared “scared.” Johnson asked Eubanks what was wrong, and he replied that he did not know. Johnson moved into her bedroom and called for her son to get up. When Daviyon failed to respond, Johnson went back into the children’s bedroom. Eubanks picked Daviyon up, and Johnson described the child as limp “like a little Raggedy Ann doll.” Johnson testified she took Daviyon into the bathroom, where she observed that “the whole side of [his] face was just black and blue and red.” Johnson testified she asked Eubanks what had happened. He again told her that he did not know, but he added that the children had both reverted
 
 *609
 
 from their toilet training and soiled their clothing. Johnson also testified that Eu-banks told her that Inecia had hit her older brother in the head with a stick that had been used to secure the apartment’s patio door.
 

 ¶ 5. Johnson then went to a neighbor’s apartment to telephone her mother and aunt. She asked them to come to get her and Daviyon and take them to CMMC. She then returned to the apartment, where she undressed Daviyon, washed him thoroughly, wrapped him in a blanket, and threw on a coat to meet her mother at the door. Johnson then took her daughter to an upstairs neighbor, Emma Robinson. When her mother arrived, Johnson testified that Eubanks said he would stay and clean up the apartment; Johnson was surprised he did not accompany them to the hospital. Johnson, Daviyon, her mother, and her aunt then left for the nearby CMMC.
 

 ¶ 6. CMMC could not stabilize Daviyon, and about an hour later, Daviyon was sent by ambulance to the University of Mississippi Medical Center (UMMC). Johnson returned to the apartment to pick up her daughter before continuing on to UMMC. Johnson testified that during the ride to UMMC, Inecia appeared “[q]uiet, scared. Like she was terrified.” Johnson observed that ordinarily Inecia “never stopped talking,” but she had been silent since Johnson returned home. In the car, Johnson asked the child, “Raja[,] what happened?”
 
 [1]
 
 Johnson testified, over the objection of the defense, that Inecia responded, “[Djaddy hit Doc with the stick in the head a lot of times[,j and he hit me too. Then Doc started crying[,j and [Djaddy wouldn’t stop hitting him. And then Doc stopped crying[,j and he didn’t move no [sic] more.”
 

 ¶7. Johnson testified that at UMMC, Daviyon could be kept alive only by machine. Two days later, her son was removed from life support, and he died. Johnson also testified that when she ultimately returned to the apartment, Eu-banks had not cleaned it up. She identified the stick that had been used to keep the patio door locked. She explained that after the door was repaired, she placed it in a closet where it had remained, except on one occasion when Eubanks used the stick to play baseball with neighborhood children.
 

 ¶ 8. Jackson Police Department child protection officers were called on the night of the incident to investigate the suspected abuse of Daviyon. Based on their interview of Johnson, an arrest warrant was issued for Eubanks, who turned himself in the next day and consented to an interview with the officers.
 

 ¶ 9. Officer Harvey Davis of the child protection unit testified as to Eubanks’s statement. Eubanks first said that he heard a loud scream and found Inecia hitting Daviyon with the stick. Officer Davis testified that Eubanks told the officers that he had hit Daviyon with a belt because he had written on the wall. Eu-banks then stated that he did not know what had happened because he had smoked marijuana and drank beer earlier. Officer Davis also testified that Eubanks said he had been playing with the children, tossing Daviyon into the air and allowing him to fall back onto the mattress. Eu-banks also explained that he and Daviyon had played a punching game, with Eu-banks punching the child in the shoulder area, but not anywhere below the shoulder.
 

 ¶ 10. Detective Eric Smith testified that he recovered the stick Johnson had previ
 
 *610
 
 ously identified. He testified that it was found in the living room of the apartment, leaning against the wall in a corner. He stated that he observed what appeared to be blood on the stick.
 

 ¶ 11. Dr. Stephen Hayne, who autopsied Daviyon’s body, also testified for the State. He stated that the cause of death was closed head injury, which was a product of blunt force trauma to the head. Dr. Hayne also described other injuries, which included bruising and abrasions on both sides of Daviyon’s head, face, eyes, chest, back, buttocks, and thighs. He also noted three fractured ribs, tears and bruising to the rectum consistent with penetration, and bruising and abrasions to the genitals. Dr. Hayne opined that the injuries he observed had occurred approximately two days prior to death, and the injuries could not have been inflicted accidentally.
 

 ¶ 12. The defense put on no witnesses, and Eubanks did not testify. He was subsequently convicted of capital murder and sentenced to life imprisonment without eligibility for parole. On appeal, Eubanks argues two assignments of error.
 

 DISCUSSION
 

 I. Whether the trial court erred in admitting hearsay testimony.
 

 ¶ 13. Eubanks argues that the trial court erred in admitting the hearsay testimony of two-year, eleven-month-old Inecia. He asserts that the trial court erred in three distinct respects, so we shall address each separately.
 

 A. Whether Inecia’s hearsay statements were properly admitted as an excited utterance.
 

 ¶ 14. Hearsay statements are excluded under Mississippi Rule of Evidence 801(c), which defines hearsay as “a statement, other than one made by the declar-ant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 803(2), however, provides an exception to the exclusion of hearsay evidence, namely a statement “relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” The official comment to Rule 803(2) elaborates, stating in pertinent part:
 

 The underlying theory of the excited utterance exception is that circumstances may create such an excited condition that the capacity for reflection is temporarily impeded and that statements uttered in that condition are thus free of conscious fabrication.... [T]he essential ingredient here is spontaneity. With respect to the time element, the issue is the duration of the excited state. This, depending on the exact circumstances of a case, can vary greatly....
 

 ¶ 15. Eubanks asserts that Inecia’s hearsay statement was neither spontaneous nor made while the child was still under the stress of the incident.
 

 ¶ 16.. Eubanks argues that Inecia was no longer “under the stress of excitement” caused by the incident.
 
 See
 
 M.R.E. 803(2). In particular, Eubanks argues that too much time had passed between the beating and Inecia’s statement to her mother. He argues that the beating was only shown to have occurred at some point during the six hours that Johnson was visiting her grandmother at CMMC and that, based on Johnson’s testimony, approximately two hours had passed since she first returned home. Therefore, Eubanks argues that the beating occurred at least two hours, and at most eight hours, prior to the statement being given. Eubanks also argues that Inecia’s statement was not spontaneous, because it was made in response to a question posed by her mother.
 

 
 *611
 
 ¶ 17. Mississippi law does not provide a specific time period for a statement to be admitted as an excited utterance.
 
 Smith v. State,
 
 733 So.2d 793, 798(¶ 18) (Miss.1999) (observing that twenty-four hours appeared to be the practical limit in prior cases). As the comment to Rule 803(2) states, the time element, “depending on the exact circumstances of a case, can vary greatly.” We have noted that “[i]t is important that there has been no intervening matter to eliminate the state of excitement and call into question the reliability of the utterance.”
 
 McCoy v. State,
 
 878 So.2d 167, 173(¶ 12) (Miss.Ct.App.2004) (citing
 
 Berry v. State,
 
 611 So.2d 924, 926 (Miss.1992)).
 

 ¶ 18. The comment to Rule 803(2) states that spontaneity is “the essential ingredient” in admitting a hearsay statement as an excited utterance. Nonetheless, our case law is clearly consistent with the proposition that “[t]he mere fact that the statement ... was in response to an inquiry ... does not necessarily take [it] outside the realm of admissible excited utterances.”
 
 Barnett v. State,
 
 757 So.2d 323, 330(¶ 18) (Miss.Ct.App.2000) (citing
 
 Sanders v. State,
 
 586 So.2d 792, 795 (Miss.1991)). Indeed, the supreme court has held that “[w]here the excited utterance is prompted by a simple question, even from an officer, such as ‘What happened?’ or ‘What’s wrong?’ ” it may still fall under the exception.
 
 Carter v. State,
 
 722 So.2d 1258, 1261(¶ 10) (Miss.1998) (citations omitted).
 

 ¶ 19. Whether to admit hearsay evidence as an excited utterance is entrusted to the sound discretion of the trial court, and we review such decisions for an abuse of discretion.
 
 Davis v. State,
 
 611 So.2d 906, 914 (Miss.1992).
 

 ¶ 20. On our review of the record, we find that the trial court did not err in finding that Inecia was still under the stress of the excitement at the time of the statement. While Eubanks argues that the beating could have occurred up to eight hours before, such does not, per se, preclude a finding that the child was still under stress at the time she made the statement. Instead, we must look at the exact circumstances of the case.
 

 ¶ 21. The record reflects that Inecia, a child of two years and eleven months, was beaten by a man she regarded as her father. She then witnessed her four-year-old brother receive a savage beating that left him mortally wounded and comatose. Sometime later, Johnson returned to the apartment, where she observed that her daughter was in the same room as Eu-banks and Daviyon. Johnson observed that Inecia acted unusual and appeared to be under great stress. Johnson, however, was preoccupied with her son and, within a few minutes, left Inecia in the care of a neighbor. When Johnson returned, approximately two hours later, she observed that Inecia still appeared to be under stress. A few minutes later, Johnson asked the child, “What happened?,” which prompted the statement that was ultimately admitted as an excited utterance.
 

 ¶ 22. The record, therefore, indicates that the child spent the great majority of the time following the incident either in the presence of the perpetrator or in the care of a neighbor. Once returned to her mother’s care, Johnson testified that Ine-cia appeared to still be under great stress, and Inecia made the statement shortly thereafter. Under these circumstances, the trial court did not err in finding the statement to have been made while the child was under the stress of the incident.
 

 ¶ 23. Likewise, the trial court did not abuse its discretion in finding the statement spontaneous, notwithstanding the time that passed or that it was prompted by a general question from Johnson. Essentially, Inecia’s statement was made at
 
 *612
 
 the first reasonable opportunity she had to tell a trusted relative what had occurred.
 
 See Heflin v. State,
 
 643 So.2d 512, 519 (Miss.1994). Furthermore, the question itself, “What happened?,” has been specifically cited by the supreme court as an example of a question that, while bearing upon the spontaneity requirement, does not necessarily preclude admission of the statement as an excited utterance.
 
 See Carter,
 
 722 So.2d at 1261(¶ 10). On our review of the record, nothing in the question itself or the surrounding circumstances indicates that this was the sort of leaded or manufactured declaration that the spontaneity requirement guards against.
 
 See Sanders,
 
 586 So.2d at 795. Accordingly, the trial court did not abuse its discretion in finding the statement sufficiently spontaneous.
 

 ¶ 24. Having found that the trial court did not abuse its discretion in finding the hearsay statement was made spontaneously under the stress of the incident, we likewise find that the trial court did not abuse its discretion in admitting the hearsay statement as an excited utterance under Rule 803(2). This issue is without merit.
 

 B. Whether the trial court erred in not evaluating whether the child was competent to testify.
 

 ¶ 25. Eubanks argues that the trial court should have held a competency hearing to determine whether Inecia was competent to testify. The child did not, however, actually testify at trial. Under Mississippi Rule of Evidence 803, an excited utterance is admissible notwithstanding the availability of the declarant at trial; the declarant’s present competence to testify is therefore irrelevant. This issue is without merit.
 

 C. Whether admission of the child’s hearsay statements violated the Confrontation Clause.
 

 ¶ 26. Finally, Eubanks argues that admitting Inecia’s hearsay statements, without allowing him an opportunity to cross-examine the child, violated his Sixth Amendment right to confront the witnesses against him.
 

 ¶ 27. The United States Supreme Court, however, has stated that this right exists only where the hearsay statement in question is “testimonial” in nature.
 
 See Crawford v. Washington,
 
 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In
 
 Crawford,
 
 the United States Supreme Court declined to provide a precise definition of “testimonial” hearsay, stating only that “[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.”
 
 Id.
 

 ¶ 28. The Mississippi Supreme Court “has concluded that a statement is testimonial when it is given to the police or individuals working in connection with the police for the purpose of prosecuting the accused.”
 
 Bishop v. State,
 
 982 So.2d 371, 375(¶ 10) (Miss.2008) (internal quotations omitted);
 
 see also Giles v. California,
 
 - U.S. -, - - -, 128 S.Ct. 2678, 2692-93, 171 L.Ed.2d 488 (2008) (“Statements to friends and neighbors about [domestic] abuse and intimidation ... would be excluded, if at all, only by hearsay rules.... ”).
 

 ¶ 29. From our review of the record, it is evident that Johnson was neither a police officer, nor was she “working in connection with the police for the purpose of prosecuting the accused” at the time she received Inecia’s hearsay statement. Accordingly, the hearsay statement was non-testimonial in nature, and the Confronta
 
 *613
 
 tion Clause is inapplicable. This issue is without merit.
 

 II. Whether the trial court erred in granting the State’s motion in li-mine.
 

 ¶ 30. Eubanks argues that the trial court erred in granting the State’s motion in limine to preclude him from introducing accusations that Johnson had abused or mistreated her children on prior occasions. This, Eubanks asserts, violated his constitutional right to present a defense notwithstanding that it was within the trial court’s discretion under the Mississippi Rules of Evidence.
 

 ¶ 31. The United States Supreme Court has stated:
 

 State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. This latitude, however, has limits. Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve.
 

 Holmes v. South Carolina,
 
 547 U.S. 319, 324-25, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (internal citations and quotations omitted).
 

 ¶ 32. When it granted the State’s motion in limine, the trial court clearly stated that its ruling was conditioned on the absence of any evidence connecting Johnson to Daviyon’s injuries. The trial court stated that if such evidence were presented, it would revisit the issue if Eubanks raised it. Eubanks, however, did not raise the issue again, nor did he proffer the proposed testimony. In fact, on our review of the record, we can find no evidence that tied Daviyon’s injuries to any prior abuse by Johnson. Instead, the testimony, particularly that of the medical examiner, was that Daviyon’s many injuries were inflicted on November 19, 2003.
 

 ¶ 33. On appeal, Eubanks argues that a jury, after hearing accusations that Johnson had abused her children on prior occasions, could have concluded that Johnson caused the child’s injuries on November 19, 2003. Other than Johnson’s admission that she was present at the apartment until approximately noon, Eubanks cites no other evidence supporting this theory. The Constitution, however, does not entitle a defendant to introduce evidence that “is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant’s trial.”
 
 Holmes,
 
 547 U.S. at 327, 126 S.Ct. 1727. This assignment of error is without merit.
 

 ¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . “Raja" was Inecia's nickname, and Daviyon was also called “Doc.”